**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————x
                             :

| | |
|---|---|
| DARRELL A. PURIFOY and LYNDA C. PURIFOY, on Behalf of Themselves and All Others Similarly Situated, : | |
| : | |
| Plaintiffs, : | Case No. _____ |
| : | |
| v. : | CLASS ACTION |
| : | |
| WALTER INVESTMENT MANAGEMENT : | DEMAND FOR JURY TRIAL |
| CORPORATION; GREEN TREE : | |
| SERVICING, LLC; GREEN TREE : | |
| INSURANCE AGENCY, INC.; AMERICAN : | **COMPLAINT** |
| RELIABLE INSURANCE COMPANY; and : | |
| ASSURANT, INC., : | |
| : | |
| Defendants. : | |

————————————————————x

Plaintiffs Darrell A. Purifoy and Lynda C. Purifoy (hereinafter "Plaintiffs"), by and through their undersigned attorneys, make the allegations listed herein upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on Plaintiffs' personal knowledge, against Walter Investment Management Corporation ("WIMC"), Green Tree Servicing, LLC ("Green Tree Servicing") and Green Tree Insurance Agency, Inc. ("GTIA") (hereinafter, collectively referred to with WIMC and Green Tree Servicing as "Green Tree"), Assurant, Inc., and American Reliable Insurance Company ("ARIC") (hereinafter, collective referred to with Assurant, Inc. as "Assurant"). Except as otherwise provided herein, Green Tree and Assurant shall be collectively referred to as "Defendants."

1

## I.   __INTRODUCTION__

1.     Plaintiffs and the Class members have mortgages secured by residential property, and were charged for lender-placed (also known as "force-placed") hazard insurance by Green Tree.

2.     Although lenders generally have the right to force-placed insurance where the property securing the loan is not insured by the borrower, Green Tree has abused that right by (1) purchasing backdated policies, (2) charging borrowers for expired or partially expired coverage, and (3) arranging for kickbacks, commissions, and other compensation for itself and/or its affiliates in connection with force-placed hazard insurance coverage.

3.     Plaintiffs allege that Defendants have derived, and continue to derive, improper financial benefits by imposing force-placed insurance policies on properties, some of which are already covered by sufficient insurance policies purchased by the borrowers.  Further, Plaintiffs allege that Green Tree improperly charged borrowers for Green Tree's "cost" of procuring force-placed insurance from its contracted insurance agents, but a portion of such "cost" is returned, transferred or paid to Green Tree and/or its related entities.

4.     Assurant actively participated in this scheme, which is explained in further detail below, by issuing backdated lender-placed hazard insurance policies for Green Tree and by paying kickbacks, commissions, or other compensation to Green Tree in return for their business.

5.     A November 10, 2010 article in *American Banker* first revealed that force-placed insurance creates a financial windfall for the major national mortgage lenders.  *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (Nov. 10, 2010, 12:00 p.m.), http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-028474-1.html (Ex. 1, hereinafter "Ties to Insurers").  Assurant Inc., the

parent company of ARIC, had its stock price drop 11% the day after the *American Banker* article was published. Notwithstanding the deceptive kickbacks, commissions, and backdating scheme, internal emails reveal that numerous bank employees admitted that the rates cited in the *American Banker* article were "unreasonable" and needed to be changed.

6.      Defendants engaged in this conduct in bad faith, knowing that their actions were not authorized by borrowers' mortgage contracts and were inconsistent with applicable law.

7.      Based on this conduct, Plaintiffs, on behalf of themselves and similarly situated Class members, assert claims against Green Tree for breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), unjust enrichment (Count III), and conversion (Count IV). In addition, Plaintiffs assert claims against Assurant for unjust enrichment (Count V) and tortious interference with a business relationship (Count VI).

8.      Plaintiffs and the putative classes have sued to recover damages equal to the amount of the improper and inequitable financial benefit received by Defendants and/or their affiliates as a result of this anti-consumer practice, and seek injunctive relief, corresponding declaratory relief, monetary relief, and other appropriate relief for Defendants' unlawful conduct, as described herein.

## II.    **PARTIES**

9.      Plaintiff Darrell A. Purifoy is an individual residing in Hillsborough County, Florida. Plaintiff is a member of the proposed Nationwide Class as well as the Florida Subclass as defined below.

10.     Plaintiff Lynda C. Purifoy is an individual residing in Hillsborough County, Florida. Plaintiff is a member of the proposed Nationwide Class as well as the Florida Subclass as defined below.

11.    Defendant Walter Investment Management Corp. ("WIMC") is a corporation existing under the laws of Maryland with its principal place of business in Tampa, Florida. WIMC is a fee-based business services provider to the residential mortgage industry and considers itself a specialty servicer providing residential loan servicing that focuses on credit-sensitive residential mortgage assets located in the United States.  According to WIMC's Form 10-K, filed March 9, 2012, WIMC also owns and controls a mortgage portfolio and operates an insurance agency servicing residential loan customers and providing voluntary and lender-placed hazard insurance for residential loans, as more fully described herein.  WIMC, Annual Report (Form 10-K), at 5 (Mar. 9, 2012).  On July 1, 2011, WIMC acquired Green Tree Servicing and GTIA.  At all relevant times, WIMC actively participated in and controlled the operations of Green Tree, and is and was wholly responsible for the acts of Green Tree described herein.

12.    Defendant Green Tree Servicing, LLC ("Green Tree Servicing") is a wholly-owned subsidiary of WIMC and a Delaware limited liability company with its principal place of business in St. Paul, Minnesota.  Green Tree Servicing considers itself one of the country's leading servicers of home loans.  *See* Green Tree Servicing, http://www.gtservicing.com (last visited Dec. 4, 2013).  According to WIMC's Form 10-K, Green Tree Servicing recently added 259,000 new servicing accounts, with approximately $48.3 billion in unpaid principal balances on these accounts.  WIMC, Annual Report (Form 10-K), at 6 (Mar. 9, 2012).  Green Tree Servicing's servicing accounts provided roughly $126.6 million in servicing fees during 2011. *Id.*  At all relevant times herein, Green Tree Servicing held themselves out as the purported servicer of the loan at issue herein.  Further, Green Tree Servicing is actively controlled by WIMC, who owns and exercises exclusive control over GTIA as well.

4

13.     Defendant Green Tree Insurance Agency, Inc. ("GTIA") is a wholly-owned subsidiary of WIMC, and a corporation existing under the laws of the State of Minnesota with its principal place of business in St. Paul, Minnesota.  Further, upon information and belief, GTIA performs no functions related to the force-placed insurance process and yet collects a "commission" tied to a percentage of the cost of each force-placed insurance premium, and is simply used as a conduit for Assurant to return kickbacks and commissions to Green Tree Servicing.  According to its Form 10-K, WIMC's insurance segment generated $40.8 million in revenue from force-placed or "lender placed" insurance.  WIMC, Annual Report (Form 10-K), at 6 (Mar. 9, 2012).  The WIMC Form 10-K lists over 207,000 outstanding policies as of December 31, 2011, of which 94% were written by Green Tree.  *Id.*  Finally, state and federal regulators are already considering new regulations related to lender-placed insurance that will reduce or prevent entities such as GTIA from collecting insurance commissions for a related or affiliate entity such as at issue in this action.  *Id.* at 12.

14.     Defendant Assurant, Inc. is a publicly traded Delaware corporation with its principal place of business at One Chase Manhattan Plaza, New York, New York.  According to its website, Assurant, Inc. is a provider of specialized insurance products including force-placed insurance (or "lender-placed insurance").  *See* Assurant, Inc., http://www.assurant.com/about (last visited Dec. 4, 2013).  According to its 2012 Annual Report, "the majority of [Assurant Inc.'s] lender-placed agreements are exclusive" and those agreements require Assurant, Inc. and its affiliate entities to "automatically issue these policies when a borrower's insurance coverage is not maintained."  Assurant, Inc., Annual Report (Form 10-K), at 4 (Feb. 23, 2012).  Assurant, Inc., along with QBE insurance, controls about 90% of the force-placed insurance market.  *See* Mary Williams Walsh, *New York investigates Insurer Payments to Banks*, N.Y. Times (May 21,

2012)        http://www.nytimes.com/2012/05/22/business/new-york-investigates-home-insurer-payments-to-banks.html (Ex. 2).    Assurant, Inc. uses "a proprietary insurance-tracking administration system linked with the administrative systems of our clients to continuously monitor the clients' mortgage portfolios to verify the existence of insurance on each mortgaged property and identify those that are uninsured" and when a lapse is confirmed, "a lender-placed policy is procured by the lender."  Assurant, Inc., Annual Report (Form 10-K), at 4 (Feb. 23, 2012).

15.    Defendant American Reliable Insurance Company ("ARIC") is an insurance company writing force-placed insurance policies in all 50 states and the District of Columbia with its principal address in Scottsdale, Arizona.  It is a wholly-owned subsidiary of Assurant, Inc. and is one of their exclusive force-placed insurance providers.  ARIC sometimes operates under the trade names Assurant Solutions and Assurant Specialty Property.  ARIC contracts with Green Tree and their mortgage servicing subsidiaries and affiliates whereby it acts as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans serviced by Green Tree and their subsidiaries and affiliates, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

## JURISDICTION AND VENUE

16.    The Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), requires that this action be brought before this Court.

17.    Plaintiff Darrell A. Purifoy was at all relevant times hereto, a citizen of the State of Florida.

18.     Plaintiff Lynda C. Purifoy was at all relevant times hereto, a citizen of the State of Florida.

19.     This Court has personal jurisdiction over Defendants because they are foreign corporations authorized to conduct business in New York (either expressly or through a wholly-owned subsidiary), are doing business in New York, and have registered with the New York Secretary of State, or do sufficient business in New York, have sufficient minimum contacts with New York, or otherwise intentionally avail themselves of the New York consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in New York.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

20.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

21.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because at all times relevant hereto, Green Tree Servicing, GTIA, Assurant, Inc., and ARIC each have registered agents in New York, WIMC actively participated in and controlled the operations of Green Tree, is and was wholly responsible for the acts of Green Tree, including acts taken and business conducted in New York, and a substantial portion of the practices complained of herein occurred in the Southern District of New York, and/or because Defendants have received substantial compensation as a result of doing business in the Southern District of New York.  Moreover, at

all times material to the allegations contained herein, Defendants personally and/or through an agent:

        a.    operated, conducted, engaged in, and carried on a business venture in the Southern District of New York or had an office or agency in the Southern District of New York; and/or

        b.    engaged in substantial activity within this state and district.

22.    All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

**A.**    **Plaintiffs Darrell & Lynda Purifoy**

23.    Plaintiffs Darrell A. Purifoy and Lynda C. Purifoy own a home in Hillsborough County, Florida. On or about November 15, 2006, Plaintiffs executed a mortgage with Gateway Business Bank d/b/a Lenders Direct, secured by their residence in Hillsborough County, Florida ("Purifoy Mortgage"). *See* Ex. 3.

24.    Paragraph 5 of the Purifoy Mortgage states the following:

**5.**    **Property Insurance.**    Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.

                 *       *       *

    If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.

8

*See* Purifoy Mortgage at 5, ¶ 5.

25.     Paragraph 9 of the Purifoy Mortgage states the following:

**9.     Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**   If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument . . ., then Lender may do and pay for whatever is reasonable or appropriate *to protect Lender's interest in the Property* and rights under this Security Instrument[.]

*See* Purifoy Mortgage at 6, ¶ 9 (emphasis added).

26.     On or around September 1, 2011, Bank of America, N.A. assigned the servicing rights to the Purifoy Mortgage to Green Tree Servicing.

27.     On or around September 16, 2011, Plaintiffs received a warning letter from Green Tree Servicing stating that Green Tree Servicing's records indicated that the Purifoys did not have sufficient property insurance on their home (hereinafter "Proof of Insurance Letter").   *See* Proof of Insurance Letter, Ex. 4.   The letter was signed by "Green Tree Servicing, LLC" and listed a return address of "Green Tree, Insurance Center, Miami, FL 33197."   *Id.*   However, upon information and belief, Green Tree Servicing does not own or operate an "insurance center" in Miami, FL, and instead, this address represents a data processing center operated by Assurant, Inc.

28.     On or around October 17, 2011, Plaintiffs received a second letter from Green Tree Servicing, wherein Green Tree Servicing stated that the Purifoys had fifteen (15) days to provide Green Tree Servicing with proof of sufficient insurance on the Purifoys' home ("Second Proof of Insurance Letter").   *See* Second Proof of Insurance Letter, Ex. 5.   This letter was also signed by "Green Tree Servicing, LLC" and listed the return address of "Green Tree, Insurance Center, Miami, FL 33197," which is actually an Assurant facility.   *Id.*   Upon receiving the Second Proof of Insurance Letter, the Purifoys responded to Green Tree Servicing with a letter sent by certified mail notifying Green Tree Servicing that they were unclear as to what role

9

Green Tree Servicing played in the servicing of their loan, and also notifying Green Tree Servicing that they had been making timely payments to Bank of America who was also accepting the same, and requesting an additional fifteen (15) days to secure insurance and clarify the role Green Tree Servicing played in servicing their loan.

29.    The October 25, 2011 letter from the Purifoys was received by Green Tree Servicing but the Purifoys never received a response to their requests for clarification and a brief extension to provide proof of insurance. Instead, on November 2, 2011, the Purifoys received a letter from Green Tree Servicing ("Notice of Placement Letter") informing the Purifoys that Green Tree Servicing had purchased a force-placed insurance policy and charged the premium for this force-placed insurance policy to the Purifoys' escrow account. *See* Notice of Placement Letter, Ex. 6.

30.    Green Tree Servicing used their affiliated insurance agency Green Tree Insurance to purchase this force-placed insurance policy from ARIC and ARIC paid Green Tree Insurance, an affiliate of Green Tree Servicing, a commission for purchasing this force-placed insurance policy. *Id.* The Purifoy Mortgage does not authorize Green Tree Servicing to charge the Purifoys' account regardless of whether Green Tree Servicing received compensation from such charges, and also does not authorize Green Tree Servicing to purchase a backdated insurance policy and charge the Purifoys for the premium of the same.

31.    Even though this policy was purchased on or around November 2, 2011, the effective date of the force-placed insurance policy was backdated to September 1, 2011, even though this period had passed and there was no risk of loss to Green Tree Servicing or any other entity, and continued for one year until September 1, 2012. *See* ARIC Force-Placed Insurance Policy, Ex. 7. Further, the premium for this force-placed insurance policy was $3,943.13 and the

amount of coverage purchased by Green Tree Servicing was $140,155, which was nearly twice the estimated fair market value of the Purifoys' home at that time. *Id.*

32.   Upon providing proof of insurance immediately, the force-placed hazard insurance policy through ARIC was canceled, but Green Tree Servicing continues to attempt to collect an amount equal to $1,237.90 for the two-month backdated period between September 2011 and November 2011. *See* January 19, 2012 Green Tree Response Letter, Ex. 8.

**B.    Force-Placed Insurance Background**

33.   In order to ensure that the mortgagee's interest in the secured property is protected, mortgage contracts typically allow the lender or third-party servicer discretion to "force-place" insurance when the homeowner fails to maintain the insurance with the amounts disbursed for the procurement of such insurance becoming additional debt secured by the mortgage. Plaintiffs' mortgage contract contains such a provision. *See* Purifoy Mortgage, *supra.* As such, Plaintiffs allege that charging force-placed insurance premiums containing undisclosed kickbacks or commissions as additional debt secured by the mortgage constitutes a credit transaction subject to the Truth In Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*

34.   However, the discretion afforded to Green Tree Servicing to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage itself. Green Tree Servicing routinely exceeds the bounds of reasonableness and the spirit, intent, and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property and through other conduct described herein with respect to the force placement of insurance.

35.   Specifically, the mortgage contract does not disclose that the lender or loan servicer will receive an improper financial benefit (regardless of the form) in connection with the

force-placed insurance policy.  Instead, the contract only states that the lender may take action for the purpose of protecting the *lender's interest* in the secured property.  *See, e.g.*, Purifoy Mortgage at 6 ¶ 9.  Likewise, the Notice of Placement of Insurance letter sent to Plaintiffs advising them that a policy had been force-placed misrepresents that force-placement is "to protect [the Lender's] interests in the collateral," and further states that "the *premium* for the insurance may be charged to the [borrowers'] to the escrow account and repayment will be governed by the Real Estate Settlement Procedures Act."  *See, e.g.*, Notice of Placement of Insurance, *supra*.

36.     Force-placed insurance policies are almost always more expensive than standard insurance coverage as is clearly shown by Plaintiffs' policy.  Reportedly, such policies can cost as much as ten times more than standard policies.  While the force-placed insurance policy is primarily for the benefit of the lender, the excessive cost is passed on to the borrower.  *See* Ties to Insurers; *see, e.g.*, American Banker Wins Investigative Journalism Award, American Banker (Mar. 18, 2011, 1:07 p.m.), http://www.americanbanker.com/news/sabew-1034635-1.html (Ex. 9).

37.     Once a lender and/or servicer received evidence that a borrower has obtained his or her own insurance policy, the force-placed coverage should be cancelled and the premiums should be fully or partially refunded.

### C.     Mortgage Loan Lenders and/or Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers

38.     The force-placing of insurance policies can be a very lucrative business for lenders and servicers.  Commonly, the lender and/or servicer selects the provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive an improper financial benefit.  The lender and/or servicer benefits by placing the policy either:

(a) with an affiliate; or (b) with a third-party provider who has already agreed to share revenue with the lender and/or servicer in the form of a direct payment or through a "captive reinsurance agreement" whereby "reinsurance" premiums are ceded to a subsidiary/affiliate of the lender and/or servicer.

39.     Although Green Tree has tried to keep its own commission arrangement with Assurant secret, it is well-known that Assurant pays millions of dollars in commissions each year to lenders and/or loan servicers, including Green Tree Servicing, that force-place coverage through ARIC, or another subsidiary of its parent company Assurant, Inc.

40.     This commission arrangement forms the basis of Plaintiffs' unjust enrichment claims against Assurant.  Specifically, Plaintiffs allege that they have conferred a benefit upon Assurant, and Assurant has accepted and inequitably retained such benefit, by being forced to pay for premiums on insurance policies that were backdated and inflated due to kickbacks and commissions between Assurant and its lender/servicer clients, including Green Tree, for the exclusive right to force-place insurance.  This benefit was not authorized under the terms of Plaintiffs' mortgage contracts, and was conferred independent of any contractual obligation Plaintiffs have with Green Tree to maintain required insurance on the property at issue.

41.     Under the direct payment arrangement, the provider of the force-placed insurance policy pays a portion of the premium collected either directly to the lender and/or servicer or to a subsidiary posing as insurance "agent" as a commission or as a "reimbursement" of the lender and/or servicer's "incurred expenses" related to force-placing the insurance.  Typically, where such payments are commissions, they are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the lender and/or servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

42.    Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring lender and/or servicer.   In return for the subsidiary's purported agreement to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.   For example, Assurant, the nation's largest provider of force-placed insurance with multiple subsidiaries and affiliates, including those such as ARIC for whom Green Tree has produced force-placed insurance policies, has acknowledged that its force-placed insurance division "write[s] business produced by clients, such as mortgage lenders and servicers and financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients."  *See* Assurant, Inc., Annual Report (Form 10-K), at F-58 (Feb. 23, 2012).

43.    Illustrative of the typical kickback arrangements is the following graphic from *American Banker*:



44.     Borrowers have no say or input into the carrier or terms of the force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and/or servicer and the insurer, rather than negotiated between the borrower and the insurer.

45.     For their part, lenders and/or servicers have no incentive to comparison shop for the best rate as this is just passed along to the borrowers.  Rather, servicers are financially motivated to refer borrowers to the providers that will provide the best financial benefit to the lender and/or servicer in terms of commission and/or ceded reinsurance premiums.

46.     Commonly, a mortgage loan lender and/or servicer enter into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance.  For example, in its public filings, Assurant—the parent of ARIC—states that it establishes "long-term relationships" with leading lenders and servicers and that the majority of its lender-placed agreements are exclusive.  *See* Assurant, Inc., Annual Report (Form 10-K), at 4 (Feb. 23, 2012) ("The majority of our lender-placed agreements are exclusive.")

47.     Upon information and belief, Green Tree Servicing, either on its own or through its controlling parent companies, is party to an agreement with Assurant pursuant to which it receives payments for the referral of business through one or more of the arrangements described above.

48.     Force-placed insurance policies are not underwritten on an individual policy basis.  Rather, lenders' and/or servicers' contracts with force-placed insurance providers such as Assurant and/or its subsidiaries require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

49.     Lenders and/or servicers often go as far as to actually outsource their insurance processing to the force-placed insurance provider.  The provider then continuously monitors the lender and/or servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property.  In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the lender and/or servicer.  Thus, where these lenders and/or servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Ties to Insurers, *supra*.

50.     "The incentives and potential for abuse in the administration of LPI [lender placed insurance] are great.  Consumers do not request the insurance, but are forced to pay for it.  The cost of LPI is much higher than a policy the borrower would purchase on his or her own.  Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage." *See Insurance Oversight: Policy Implications for U.S. Consumers, Businesses and Jobs: Hearing Before the Subcomm. on Insurance, Housing & Community Opportunity Comm. on Financial Services* (July 28, 2011) (testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice) (Ex. 10, hereinafter "Birnbaum Testimony").

51.     In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission—totaling hundreds of millions of dollars—out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral.  The

premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance—so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [*sic*] insurance." *Id.*

52.     While lenders and/or servicers, including Green Tree, profit greatly from the business of force-placed insurance, upon information and belief, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance.  However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year."  *See* Ties to Insurers, *supra* (noting that servicers demand generous commissions and other payments in return for their referrals).

53.     Lenders and/or servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting.  However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*See* Ties to Insurers, *supra*.

54.     Force-placed insurance providers have tools to assess risk and minimize unexpected risk of loss.  As stated succinctly in January of 2007 by industry insider John Meadows, "Leveraging technologies and data elements that are available in most servicer's systems, an innovative lender-placed carrier can offer products that take into account relevant property-specific risk characteristics to determine premium rates."  *See* John Meadows, Evaluate Processes and Controls to Ensure Insurance Efficiencies, Servicing Management (Jan., 2007) (Ex. 11).

55.     Lenders and/or servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property.   However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.  *See id.*

**D.     Defendants Charge Borrowers for Redundant or Otherwise Unnecessary Insurance**

56.     Unnecessary or inappropriately priced insurance arises when a lender and/or servicer forces borrowers to purchase and maintain hazard insurance for their property that is unnecessary, duplicative, and/or in amounts greater than required by law or their mortgage agreements.

57.     Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Green Tree Servicing has commonly required borrowers to pay for unnecessary insurance coverage.   Such examples include, without limitation: (a) backdating force-placed insurance policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for retroactive coverage for by-gone periods of time for which no risk of loss any longer exists; and (b) requiring borrowers to pay for force-placed insurance policies covering periods of time following a lapse of previous insurance despite the fact that the lender's interest in the property was covered for such time pursuant to either a "standard mortgage clause,"[1] or, upon information and belief, Lender's Loss Payable Endorsement in the previous policy, either of which continues the Lender's coverage following a lapse for non-payment of premium.

58.     Simply put, force-placed insurance policies for hazard insurance, or any other type of insurance, should not be backdated.   The National Association of Insurance

---

[1]  *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss Proceeds:  Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 31-42 (1997).

18

Commissioners ("NAIC") has indicated that insurance is "prospective in nature." *See, e.g.*, Ties to Insurers, *supra* (quoting the NAIC as stating that insurance policies "should not be back-dated to collect premiums for a time period that has already passed"). Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper and unlawful.

59.    Moreover, the overwhelming majority of mortgages, including Plaintiffs' mortgage, contain a requirement that the borrower purchase property insurance containing a "standard mortgage clause," and/or, further, upon information and belief, a "Lender's Loss Payable Endorsement," pursuant to which coverage for the lender continues even after the insured has failed to pay premiums. Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful, unfair, and unconscionable because borrowers are charged for needless and duplicative insurance coverage.

60.    Information concerning Defendants' collection of kickbacks from force-placed insurance providers has not been publicly available. As American Banker noted, "banks do not report how much they collect from such payments," and, further, force-placed insurance has been "historically an overlooked niche in the mortgage servicing industry." *See* Jeff Horwitz, Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker (Mar. 10, 2011, 12:25 p.m.), http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html (Ex. 12, hereinafter "Bead on Banks' FPI Policies").

61.    In fact, Plaintiffs and the Class members would have been more than hard pressed to discover fully the true contours of Defendants' scheme because, upon information and belief, captive reinsurance companies are often not required to file with the National Association of

Insurance Commissioners ("NAIC") the type of detailed annual reports usually required by commercial insurance companies. *See, e.g.*, Janis Mara, <u>Industry News, Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes</u> (Mar. 7, 2005), <u>http://www.alta.org/indynews/news.cfm?newsID=2571</u> (Ex. 13). Thus, even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on Defendants' affiliated captive reinsurer. One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a lawsuit.

### E.   Defendants' Practices Artificially Inflate Premiums for Force-Placed Insurance

62.    As *American Banker* observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers, *supra*. These costs are ultimately paid by the borrowers.

63.    Notably, Assurant's public filings indicate that approximately 40% of its force-placed insurance division's revenue is allocated to pay for "general expenses." Upon information and belief, this category predominantly includes commissions/referral fees paid to lenders and/or loan servicers. In other lines of insurance, overhead and expenses are usually a much smaller fraction of policyholder claims. *See id.*

64.    Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher—implying paydays for servicers amounting to hundreds of millions of dollars per year. *Id.*

65.    Defendants' practices of unlawful profiting from the force-placement of insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because

a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are instead simply funding illegal kickbacks. Amounts paid to lenders and/or servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers.

66.    Such kickback arrangements between Assurant and its lender/servicer clients (including Green Tree Servicing) are unquestionably unjust. In fact, numerous courts have previously denied motions to dismiss, condemned this type of self-dealing in connection with force-placed insurance, and questioned the commissions that the various subsidiaries of Assurant, like ARIC, pay to their lender-clients. *See, e.g., Casey v. Citibank, N.A.*, No. 12-820, --- F.Supp.2d ---, 2013 WL 11901 (N.D.N.Y. Jan. 2, 2013); *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, No. 11-3058, 2012 WL 1029502, at *23-29 (N.D. Cal. Mar. 26, 2012); *Ellsworth v. U.S. Bank, N.A.*, No. 12-2506, --- F.Supp.2d ---, 2012 WL 6176905 (N.D. Cal. Dec. 11, 2012); *Gallow v. PHH Mortg. Corp.*, No. 12-1117, --- F.Supp.2d ---, 2012 WL 6761876 (D.N.J. Dec. 31, 2012); *Montanez v. HSBC Mortg. Corp. (USA)*, No. 11-4074, --- F.Supp.2d ---, 2012 WL 2899371, at *6 (E.D. Pa. July 17, 2012); *Hofstetter v. Chase Home Fin.* LLC, No. 10-131, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011); *Williams v. Wells Fargo Bank N.A.*, No. 11-21233, 2011 WL 4901346, at *2, 4 (S.D. Fla. Oct. 14, 2011); *Gipson v. Fleet Mortg. group, Inc.*, 232 F.Supp.2d 691, 707 (S.D. Miss. Nov. 7, 2002); *Stevens v. Citigroup, Inc.*, No. 00-3815, 2000 WL 1848593, at *1, 3 (E.D. Pa. Dec. 15, 2000).

67.    These commission arrangements are also the subject of publicly-filed deposition testimony. For example, in the *Hofstetter* case, Chase's representative testified that it is "a standard industry-wide practice" for a mortgage lender to be paid a commission by the insurance

provider in connection with lender-placed insurance. *See* Wheeler Dep. 67:5-14, Jan. 11, 2011, *Hofstetter*, 2011 WL 1225900 Ex. 14.[2] Like U.S. Bank, Chase procured its force-placed insurance coverage through a subsidiary of Assurant. *Id.* at 68:16-69:14.

68.     In addition, the commission arrangements between major banks and insurance firms—including ARIC's parent company, Assurant—have been reported in *American Banker* magazine. *See* Ties to Insurers, *supra*.[3]

69.     Moreover, the commissions paid by Assurant to its lender-clients are also the subject of public regulatory filings. For example, ASIC, ARIC's sister-affiliate and subsidiary of ARIC's parent company Assurant, reported to the California Department of Insurance that it paid more than $1.8 million dollars in commissions and brokerage expenses in connection with its flood insurance program in 2010.

70.     While significant, this figure represents only a sliver of the total amount of commissions paid by the Assurant subsidiary nationwide on all force-placed policies (flood, hazard, and wind). According to a recent article published by American Banker, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars each year." *See* Bead on Banks' FPI Policies*, supra.* Even more shocking, is that while these lenders and/or servicers are bringing in hundreds of millions of dollars through its involvement in force-placed insurance, this same practice is forcing many homeowners that are struggling to pay their current mortgage payments into foreclosure.

---

[2] Shortly after the deposition testimony in *Hofstetter* became public (in March 2011), Chase entered into a multi-million dollar settlement (in July 2011), under which it agreed to disgorge 100% of the commissions that it received on force-placed flood insurance for eligible class members, and permanently refrain from accepting commissions in connection with force-placed flood insurance for HELOC borrowers. Following notice to the class members, that settlement received final approval from the United States District Court for the Northern District of California (Alsup, J.) on November 14, 2011.

[3] After publication, this article received the Society of American Business Editors and Writers award for "best investigative" writing for publications with a circulation of below 25,000.

71.     In return for the millions of dollars in commissions that are kicked back to Green Tree Servicing and other lenders and/or servicers, ARIC and its parent company, Assurant, reap *billions* of dollars in premiums.  For example, in 2012, Assurant collected approximately $1.9 billion in premiums through its specialty insurance division, which is primarily devoted to force-placed insurance.  Assurant, Inc., Annual Report (Form 10-K), at 3 (Feb. 23, 2012).

72.     On March 14, 2012, Fannie Mae issued a Servicing Guide Announcement ("SGA") pertaining to lender-placed insurance.  *See* SGA, Ex. 15.  In the SGI, Fannie Mae clarified its requirements relating to reasonable reimbursable expenses for lender-placed insurance, and stated that "reimbursement of lender-placed insurance premiums must **exclude** any lender-placed insurance commission earned on that policy by the servicer or any related entity[.]"  *Id.* at 4 (emphasis in original).[4]

73.     Earlier that same month, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender-placed insurance.  *See* RFP, Ex. 16.[5]  In the RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process, and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners."  *Id.* at 2.  In particular, Fannie Mae made the following observations:

> a.      "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them.  The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"
>
> b.      "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers

---

[4] The U.S. Department of Housing and Urban Development has promulgated similar guidance in its Lender Manual ("HUD Lender Manual").  *See* Lender Manual, Ex. 17.

[5] The RFP was labeled "Confidential" by Fannie Mae, but subsequently was published in *American Banker* magazine.  *See* Jeff Horwitz, <u>Fannie Mae Seeks to Break up Force-Placed Market, Document Shows</u>, American Banker, May 24, 2012, *available at* <u>http://www.americanbanker.com/issues/177_101/fannie-rfp-gse-contracting-document-1049630-1.html</u>.

and provide tracking, rather than those that offer the best pricing and terms . . . . Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

        c.    "[M]uch of the current legal placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*Id.* Accordingly, Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners." *Id.* at 3. Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id.* at 2.

    74.    Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interest or one where they are provided with an incentive or inducement to enter into the transaction. *See* Ties to Insurers, *supra.*

## CLASS ACTION ALLEGATIONS

**A.**    **Class Definition**

    75.    Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. As such, Plaintiffs seek to represent the following classes:

    <u>Nationwide Class:</u>   All borrowers who, within the applicable statutes of limitations, were charged for a force-placed insurance policy placed on property located in the United States, through Green Tree, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees. Excluded from this

class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

Escrow Subclass:   All persons in the Nationwide Class whose force-placed insurance premiums were escrowed by Green Tree.

Florida Subclass:   All persons in the Nationwide Class whose mortgage or line of credit owned or serviced by Green Tree was secured by property located within the State of Florida.

76.     Except as otherwise provided herein, the term "Class" shall refer to the Nationwide Class defined above.  Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

77.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.  The conduct described above is the Defendants' standard and undisputed business practices.

**B.     Numerosity**

78.     The individual class members are so numerous that joinder of all members is impracticable.  The Defendants sell and service millions of mortgage loans and insurance policies in the State of New York and nationwide.   The individual class members are ascertainable as the names and addresses of all class members can be identified in the business records maintained by the Defendants.  The precise number of class members certainly numbers in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint and impractical for each to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.     Commonality**

79.     There are questions of law and fact that are common to the Plaintiffs and Class Members' claims.  These common questions predominate over any questions that go particularly

to any individual member of the Class.  Among such common questions of law and fact are the following:

  a.  Whether Green Tree Servicing breached their respective mortgage contracts with Plaintiffs and the Class by charging them a force-placed insurance policy that included illegal kickbacks (including unwarranted commissions and reinsurance payments) and by charging Plaintiffs and the Class for servicing the loans;

  b.  Whether Defendants have unlawfully unjustly enriched themselves at the expense of Plaintiffs and the Class;

  c.  Whether Green Tree Servicing breached the implied covenant of good faith and fair dealing by entering into an exclusive arrangement with the vendor and its affiliated insurance carriers which resulted in their charging Plaintiffs and the Class members inflated and non-competitive amounts of force-placed insurance;

  d.  Whether the Defendants manipulated the force-placed mortgage purchases in order to maximize the profits to themselves to the great detriment to Plaintiffs and the Class;

  e.  Whether Green Tree Servicing or GTIA, or their respective affiliates, provide any work or services in order to receive the "economic benefit";

  f.  Whether Green Tree Servicing or GTIA wrongfully converted funds from Plaintiffs and the Escrow Subclass;

  g.  Whether the premiums charged are illegal and inflated because they include kickbacks and unwarranted "commissions";

  h.  Whether the premiums charged are illegal and inflated because they included charges for a bundle of administrative services that the vendor provides to Green

Tree that are not chargeable to Plaintiffs and the Class members under their respective mortgages;

        i.      Whether the premiums charged are illegal and inflated because they include the cost of the captive reinsurance arrangement;

        j.      Whether Defendants' arrangement and scheme to maximize unwarranted fees and kickbacks is unfair;

        k.      Whether ARIC had knowledge of Plaintiffs and the Class members' business relationship with the Green Tree Servicing pursuant to the mortgage contracts; and

        l.      Whether ARIC intentionally and unjustifiably interfered with the Plaintiffs and the Class members' rights under the mortgage contracts by paying kickbacks to the Green Tree Servicing or GTIA and by charging for administering Green Tree Servicing's loan portfolio.

**D.**    **Typicality**

80.    Plaintiffs are members of the Class as Defendants' own records plainly reveal. Plaintiffs' claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of the unlawful conduct of Defendants.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.**    **Adequacy of Representation**

81.    Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent

him.   There is no hostility between Plaintiffs and the unnamed class members.   Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

82.    To prosecute this case, Plaintiffs have chosen counsel that is very experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.**    **Requirements of FED. R. CIV. P. 23(b)(1) & (2)**

83.    Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

84.    Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**G.**    **Requirements of FED. R. CIV. P. 23(b)(3)**

85.    The questions of law or fact common to Plaintiffs and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

86.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

87.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**H.**    **Superiority**

88.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

      a.    Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside throughout the United States;

      b.    Individual claims by class members are impractical because they costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

      c.    There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

      d.    The interests of justice will be well-served by resolving the common disputes of potential class members in one forum;

      e.    Individual suits would not be cost effective or economically maintainable as individual actions; and

      f.    The action is manageable as a class action.

## CAUSES OF ACTION

## COUNT I

### BREACH OF CONTRACT
**(All Class Members Against WIMC, Green Tree Servicing, and GTIA)**

89.    Plaintiffs re-allege and incorporate paragraphs 1 through 88 above as if fully set forth herein and further allege as follows.

90.    Plaintiffs and the Class have mortgage contracts with Green Tree that are similar in all material respects.

91.    Under these mortgage contracts, Green Tree is permitted to obtain force-placed insurance in the event of a lapse, however, it is only permitted to do so in a manner and amount that is reasonable and appropriate to protect an insurable interest in the property.  Although these mortgage contracts allow Green Tree to charge the homeowners for force-placed insurance, it does not allow it to charge homeowners for illegal kickbacks, commissions, or reinsurance premiums.

92.    Further, under these mortgage contracts, Green Tree is not permitted to charge Plaintiffs for servicing the mortgage.  Green Tree breached its mortgage contracts with Plaintiffs and the Class members in at least the following respects:

a.    Choosing an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance policies to maximize their own profits;

b.    Failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby the insurance policies are continually purchased through the same companies without seeking a competitive price;

c.    Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and the Class members and misrepresenting the reason for the high cost of the policies;

d.    Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to Plaintiffs and the Class members and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

e.     Charging Plaintiffs and the Class members for commissions when the insurance is prearranged and no commission is due; and

f.     Charging Plaintiffs and the Class members for having the vendor perform their obligations of administering its mortgage portfolio which is not chargeable to Plaintiffs or the Class members.

93.   As a direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiffs and the Class have suffered damages.

WHEREFORE, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from Green Tree's breach of contract. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (All Class Members Against WIMC, Green Tree Servicing, and GTIA)

94.   Plaintiffs re-allege and incorporate paragraphs 1 through 88 above as if fully set forth herein and further allege as follows.

95.   Good faith and fair dealing is an element of every contract and imposes upon each party a duty of good faith and fair dealing in its performance. Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

96.   Where an argument permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such determination is implied.

97.   Plaintiffs and the Class members' respective mortgage contracts contained a provision that allowed the mortgage servicer to force-place an insurance policy on the borrower if their homeowner's insurance lapsed.

98.     Mortgage servicers or lenders, like Green Tree Servicing, are permitted to unilaterally choose the company to purchase force-placed insurance from and have an obligation to exercise their discretion in good faith by not choosing a company capriciously and in bad faith (solely for their or their affiliates own financial gain) instead of seeking to continue to reestablish the prior insurance policies or seeking competitive bids on the open market in good faith.

99.     The respective mortgage contracts and insurance policies of Plaintiffs and the Class members contained an implied covenant of good faith and fair dealing whereby Green Tree agreed to perform the obligations under the policies in good faith, to deal fairly with Plaintiffs and the Class, and not to charge unnecessary inflated fees for the force-placed insurance for the purposes of maximizing their own profits at the Class's expense.

100.    Green Tree breached its duty of good faith and fair dealing in at least the following respects:

        a.      Using their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance policies to maximize their own profits;

        b.      Failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby the insurance policies are continually purchased through the same companies without seeking a competitive price;

        c.      Assessing inflated and unnecessary insurance policy premiums against Plaintiffs and the Class members and misrepresenting the reason for the high cost of the policies;

        d.      Collecting a percentage or allowing its affiliates to collect a percentage of whatever premiums are charged to Plaintiffs and the Class members and not passing that

percentage on to the borrower, thereby creating the incentive to seek the highest priced premiums possible;

  e.  Charging Plaintiffs and the Class members for commissions when the insurance is prearranged and no commission is due;

  f.  Charging Plaintiffs and the Class members an inflated premium due to the captive reinsurance arrangement; and

  g.  Charging Plaintiffs and the Class members for having the vendor perform their obligation of administering its mortgage portfolios which is not chargeable to Plaintiffs or the Class members.

  101. As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class members have suffered damages.

  WHEREFORE, Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration determining that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing. Plaintiffs also seek compensatory damages resulting from Green Tree's breach of their duties. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
### (All Class Members Against WIMC, Green Tree Servicing, and GTIA)

  102. Plaintiffs re-allege and incorporate paragraphs 1 through 88 above as if fully set forth herein and further allege as follows.

  103. Green Tree received from Plaintiffs and the Class members a benefit in the form of overcharges related to force-placed insurance policies that include, but are not limited to, unwarranted kickbacks and commissions and are the result of overcharging and overreaching.

104. Green Tree entered into an agreement whereby the vendor would provide force-placed insurance policies to the Green Tree through its preferred insurance carriers, such as ARIC, for the portfolio of loans it monitored which were paid for by Plaintiffs and the Class at prices that were far higher than the market rates for policies that provide even more coverage. Green Tree knew that the charged for these policies were inflated, contained hidden or unlawful charges, and were not the result of good faith practices.

105. Commissions or kickbacks were paid directly to Green Tree Servicing and/or its affiliates, including GTIA, in order to be able to exclusively provide force-placed insurance policies.

106. The kickbacks and commissions were subsumed into the price of the insurance premium and ultimately paid by the borrower. Therefore, Green Tree had the incentive to charge and collect inflated prices for the force-placed insurance policies.

107. As a result, Plaintiffs and the Class members have conferred a benefit on Defendants and Defendants, with full knowledge of this benefit, voluntarily accepted and retained the benefit conferred on them.

108. Defendants will be unjustly enriched if they are allowed to retain the benefit, and each class member is entitled to an amount equal to the amount each class member enriched Defendants and for which Defendants have been unjustly enriched.

109. Nothing herein seeks to end Defendants' practice of placing force-placed insurance on properties. Plaintiffs simply seek that Defendants engage in this practice in good faith and not by charging the Plaintiffs and Class members for unlawful, unnecessary, hidden, and/or noncompetitive prices.

WHEREFORE, Plaintiffs, on behalf of themselves and similarly situated Class members, demand an award against Green Tree for the amounts equal to the amount each Class member enriched Green Tree and for which Green Tree has been unjustly enriched. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT IV

### CONVERSION
### (Escrow Subclass Members Against WIMC, Green Tree Servicing, and GTIA)

110.  Plaintiffs re-allege and incorporate paragraphs 1 through 88 above as if fully set forth herein and further allege as follows.

111.  Green Tree had and continues to have a duty to maintain and preserve borrowers' mortgage accounts, and mortgage escrow accounts, and to prevent their diminishment or alteration through its own wrongful acts.

112.  Green Tree wrongfully and intentionally collected insurance premiums from borrowers' mortgage escrow accounts or added such payments to borrowers' mortgage accounts.

113.  Green Tree collected these premiums by wrongfully and intentionally withdrawing specific and readily identifiable funds from borrowers' mortgage escrow accounts or misappropriating funds paid to borrowers' account balances for their regular monthly mortgage payments in order to fund its force-placed insurance scheme.

114.  Green Tree has retained these funds unlawfully without the consent of Plaintiffs and the Escrow Subclass and has deprived them from exercising control over the funds.

115.  Green Tree intends to permanently deprive Plaintiffs and the Escrow Subclass of these funds.

116.    Plaintiffs and the Escrow Subclass properly own these funds, not Green Tree, who now claims that it is entitled to ownership of the funds contrary to the rights of Plaintiffs and the Escrow Subclass.

117.    Plaintiffs and the Escrow Subclass are entitled to the immediate possession of these funds.

118.    Green Tree has wrongfully converted these specific and readily identifiable funds.

119.    Green Tree's wrongful conduct is of a continuing nature.

120.    As a direct and proximate result of Green Tree's wrongful conversion, Plaintiffs and the Escrow Subclass have suffered and continue to suffer damages.   Plaintiffs and the Escrow Subclass are entitled to recover from Green Tree all damages and costs permitted, including all amounts that Green Tree wrongfully converted, which are specific and readily identifiable.

WHEREFORE Plaintiffs, on behalf of themselves and similarly situated Escrow Subclass members, demand an award against Green Tree for the amounts equal to the amount Green Tree wrongfully converted from each Class member.   Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT V

### UNJUST ENRICHMENT
### (All Class Members Against Assurant)

121.    Plaintiffs re-allege and incorporates paragraphs 1 through 88 above as if fully set forth herein and further allege as follows.

122.    By scheming with Green Tree to manipulate the force-placed insurance process, Assurant received improper benefits that it otherwise would not have secured, including noncompetitive premiums that Assurant would not have secured absent unwarranted kickbacks

and commissions to Green Tree to do business with Assurant and premiums for backdated insurance policies.

123.    Retention of these benefits by Assurant would be unjust and inequitable because Assurant secured these handsome premium payments through improper means by offering Green Tree unwarranted kickbacks and commissions in connection with force-placed insurance coverage, backdated insurance coverage provides no appreciable value to borrowers where it already is known that the borrower suffered no loss during the backdated period, and to the extent there was a lapse in coverage, Assurant were responsible for tracking borrowers' insurance coverage so as to prevent a lapse, and should have taken steps in advance to avoid any purported "need" to backdate coverage.

124.    In furtherance of this scheme, Assurant paid and collected significant monies in kickbacks and commissions tied directly to the cost of the fore-placed insurance premium (as a percentage).

125.    As a result, Plaintiffs and the Class members have conferred a benefit on Assurant and Assurant, with full knowledge of this benefit, voluntarily accepted and retained the benefit conferred on them.  Further, no express contract exists between Plaintiffs and the Class members and Assurant.

126.    Assurant will be unjustly enriched if they are allowed to retain the benefit, and each class member is entitled to an amount equal to the amount each class member enriched Assurant and for which Assurant has been unjustly enriched.

127.    Nothing herein seeks to stop the vender or Assurant from selling force-placed insurance policies.  Plaintiffs simply seek that the Defendants provide the same in good faith and not at inflated and noncompetitive prices.

WHEREFORE, Plaintiffs, on behalf of themselves and similarly situated Class members, demand an award against Assurant for the amounts equal to the amount each Class member enriched Assurant and for which Assurant has been unjustly enriched. Plaintiffs further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT VI

### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (All Class Members Against Assurant)

128.    Plaintiffs re-allege and incorporate paragraphs 1 through 88 above as if set forth herein and further allege as follows.

129.    Plaintiffs and the Class members have a business relationship with Green Tree pursuant to their respective mortgage contracts. For example, Plaintiffs and the Class members have a right not to be charged exorbitant charges consisting of hidden kickbacks and commissions in bad faith for force-placed insurance.

130.    Assurant has knowledge of Plaintiffs and the Class members' business relationship with Green Tree pursuant to their respective mortgage contracts. Assurant is not a party to the respective mortgage contracts, nor is they third-party beneficiaries. Further, Assurant does not have any beneficial, economic, or supervisory interest in the respective mortgage contracts.

131.    Assurant intentionally and unjustifiably interfered with the Plaintiffs and Class members' rights under their respective mortgage contracts, as described above by, *inter alia*, paying kickbacks directly to Green Tree Servicing, and/or by and through GTIA, and by charging for administering Green Tree Servicing's loan portfolio, which are purposefully and knowingly charged to Plaintiffs and the Class members.

132.    Plaintiffs and the Class members have been damaged as a result of Assurant's interference with their respective mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention to their rights under the mortgages.

WHEREFORE, Plaintiffs and the Class members seek a judgment in their favor against Assurant for the actual damages suffered by them as a result of Assurant's tortious interference. Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and all similarly situated Class members demand judgment against Defendants as follows:

A.    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the classes as defined above;

B.    Awarding damages sustained by Plaintiffs and the Class as a result of Green Tree's breach of contract and the implied covenant of good faith and fair dealing, together with prejudgment interest;

C.    Finding that the Green Tree and Assurant have each been unjustly enriched and requiring each Defendant to refund all unjust benefits to Plaintiffs and the Class members, together with prejudgment interest;

D.    Funding that Green Tree has wrongfully converted funds and requiring Green Tree to refund all such wrongfully converted funds to Plaintiffs and the Escrow Subclass members;

E.       Awarding Plaintiffs and the Class members costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class members' counsel and experts, and reimbursement of expenses;

F.       Awarding damages sustained by Plaintiffs and the Class members as a result of ARIC's tortious interference; and

G.       Such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class members request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated:  February 7, 2013

Respectfully submitted,

_____
David A.P. Brower
Brian C. Kerr
BROWER PIVEN
 A Professional Corporation
475 Park Avenue South, 33d Floor
New York, NY 10016
Telephone (212) 501-9000
Facsimile (212) 501-0300
brower@browerpiven.com
kerr@browerpiven.com

Kenneth G. Gilman
kgilman@gilmanpastor.com
(*pro hac vice admission pending*)
Thomas E. N. Shea
tshea@gilmanpastor.com
(*pro hac vice admission pending*)
GILMAN LAW LLP
Beachway Professional Center Tower
3301 Bonita Beach Road, Suite 307
Bonita Springs, FL  34134
Telephone:  (239) 221-8301
Facsimile:  (239) 676-8224

*Attorneys for Plaintiffs and
the Proposed Class*