UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

No. 13-cv-937 (RJS)
_____

DARRELL A. PURIFOY, *et al.*,

Plaintiffs,

VERSUS

WALTER INVESTMENT MANAGEMENT CORP., *et al.*,

Defendants.
_____

OPINION AND ORDER
December 21, 2015
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Darrell Purifoy and Lynda Purifoy, owners of mortgages on residential property located in Florida, bring this class action on behalf of themselves and all others who are similarly situated against mortgage loan servicer Green Tree Servicing, LLC ("GTS"), its parent corporation Walter Investment Management Corporation ("WIMC"), and WIMC's other wholly owned subsidiary Green Tree Insurance Agency, Inc. ("GTIA") (collectively, with WIMC and GTS, the "Defendants") for Defendants' role in purchasing, backdating, and charging Plaintiffs for expensive hazard insurance that allegedly included improper commissions and illegal kickbacks. Specifically, Plaintiffs assert claims for breach of the mortgage contract, unjust enrichment, and conversion. Now before the Court is Defendants' motion to dismiss this action. For the reasons set forth below, the motion is granted in part and denied in part.

I. BACKGROUND

In November 2006, Plaintiffs and Gateway Business Bank executed a mortgage secured by Plaintiffs' residential property in Hillsborough County, Florida.[1]

---

[1] The facts are taken from Plaintiffs' First Amended Complaint, filed on May 24, 2013 (Doc. No. 39 ("FAC")), and the exhibits attached thereto. In ruling on Defendants' motion, the Court has also considered Defendants' Memorandum of Law (Doc. No. 43 Ex.1 ("Mem.")), Plaintiffs' Opposition (Doc. No. 45 ("Opp'n")), and Defendants' Reply (Doc. No. 46 ("Reply")). The Court notes that Plaintiffs improperly exceeded the page limit set forth in Rule 2.B of the Court's Individual Practices by supplementing their 25-page Opposition with seven pages of "exhibits" that merely assert additional legal

(FAC ¶¶ 1, 9–10, 23; *id.* Ex. 3 (the "Purifoy Mortgage").) The mortgage required Plaintiffs to maintain hazard insurance on their home "for the periods that Lender requires." (Purifoy Mortgage § 5.) If Plaintiffs, as the Borrower, failed to acquire or maintain insurance on their home that protected against "loss by fire" and "other hazards including, but not limited to, earthquakes and floods," the Lender was authorized to "obtain insurance coverage, at Lender's option and Borrower's expense." (Purifoy Mortgage § 5.) The mortgage further provided that:

> Lender is under no obligation to purchase any particular type or amount of coverage. . . . Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.

(*Id.*) In addition, the mortgage provided that if Plaintiffs failed "to perform the covenants and agreements contained" in the mortgage, the Lender was permitted to "do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument." (*Id.* § 9.) The mortgage further provided that "[a]ny amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument." (*Id.*)

After the mortgage was executed in 2006, it appears to have been sold to one or more successor banks, and, on or around September 1, 2011, Bank of America, N.A. assigned the loan servicing rights of Plaintiffs' mortgage to GTS. (FAC ¶ 26.) Subsequently, on September 16, 2011, GTS mailed a letter to Plaintiffs informing them that they did not have sufficient property insurance on their home and that if GTS did not receive evidence that Plaintiffs had purchased acceptable insurance within 45 days, GTS, through "an affiliated insurance agency," would purchase insurance at Plaintiffs' expense. (*Id.* ¶ 27, Ex. 4.) GTS further noted that, if it purchased insurance on behalf of Plaintiffs, it might earn a commission from the transaction. (*Id.*) On October 17, 2011, GTS mailed a second letter to Plaintiffs including similar language and indicating that Plaintiffs now had only 15 days to provide GTS with "proof of sufficient insurance" on their home. (*Id.* ¶ 28, Ex. 5.) In response, Plaintiffs mailed a letter to GTS on October 25, 2011, requesting an additional 15 days "to secure insurance and clarify the role [GTS] played in servicing their loan." (*Id.* ¶¶ 28–29.) GTS never responded to this letter. (*Id.*)

Instead, on November 2, 2011, GTS, through GTIA, purchased insurance on Plaintiffs' property from Assurant, Inc. ("Assurant"), whom Plaintiffs allege paid a commission to GTIA for the referral, thus artificially inflating the cost of the insurance. (*Id.* ¶¶ 30, 65.) The amount of coverage purchased was $140,155, which was "nearly twice the estimated fair market value" of Plaintiffs' home at the time, and, even though Plaintiffs allege that they had suffered "no risk of loss" between September 1, 2011 and November 2, 2011, the effective date of the policy was backdated to September 1, 2011. (*Id.* ¶ 31.) On November 2, 2011 – the same day that GTS purchased the policy – GTS mailed a

---

arguments and attempt to distinguish the cases upon which Defendants rely. The Court declines to consider these additional legal arguments and warns Plaintiffs that repeating such conduct in future filings may result in sanctions.
2

letter to Plaintiffs informing them of the insurance purchase and alerting them that a premium would be charged to their mortgage escrow account. (*Id.* ¶ 29.) The premium on the policy was $3,943.13. (*Id.* ¶ 31.) Once Plaintiffs provided GTS with proof of insurance on November 16, 2011, GTS cancelled the insurance and notified Plaintiffs that they owed GTS $1,237.90 for the backdated insurance policy. (*Id.* ¶ 32, Ex. 8.) GTS "continues to attempt to collect" this fee for the period between September 1, 2011 and November 16, 2011. (*Id.* ¶ 32.)

On February 7, 2013, Plaintiffs filed this action, asserting claims for breach of contract, unjust enrichment, and conversion against Defendants, Assurant, and Assurant's wholly owned subsidiary, American Reliable Insurance Company ("ARIC"), on the theory that all Defendants were part of a scheme in which they purchased and improperly backdated expensive force-placed insurance[2] without disclosing that illegal kickbacks and commissions had contributed to the high cost of the insurance policy. (Doc. No. 1.) On April 30, 2013, Plaintiffs voluntary dismissed Assurant and ARIC from this action. (Doc. No. 25.) On May 24, 2013, Plaintiffs filed the First Amended Complaint in this action. (Doc. No. 39.) Now before the Court is Defendants' motion to dismiss.

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *See ATSI Commc'ns*, 493 F.3d at 98. However, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

## III. DISCUSSION

### A. Breach of Contract

Because the mortgage at issue in this action contained a choice-of-law clause stating that it "shall be governed by federal law and the law of the jurisdiction in which the property is located" (Purifoy Mortgage § 16) and because federal courts follow state law when applying contract law, Florida law governs this action. *See Katz v. Berisford Int'l PLC*, No. 96-cv-8695 (JGK), 2000 WL 959721, at *8 (S.D.N.Y. July 10, 2000) (noting that a federal court sitting in diversity applies the choice-of-law

---

[2] "Force-placed" or "lender-placed" insurance refers to a lender's purchase of insurance on secured property, at the homeowner's expense, when a homeowner fails to maintain adequate insurance as required by the lender and homeowner's mortgage contract. (FAC ¶ 34.).

principles of the forum state and that New York courts "generally honor the parties' choice of law so long as the selected jurisdiction has significant contacts to the transaction"); *Farkar Co. v. R.A. Hanson DISC., Ltd.*, 441 F. Supp. 841, 845 (S.D.N.Y. 1977) ("For general principles of contract law, federal courts rely on state law."), *modified on other grounds*, *sub nom.*, 583 F.2d 68 (2d Cir. 1978).

Here, Defendants move to dismiss Plaintiffs' breach of contract claim on the grounds that: (i) WIMC and GTIA were not parties to the mortgage contract; (ii) Plaintiffs breached the contract prior to Defendants' alleged breach by failing to maintain hazard insurance on their property; (iii) GTS's purchase of backdated insurance and receipt of a commission for procuring the insurance did not constitute breaches of the contract; and (iv) Plaintiffs' claim that Defendants breached the implied covenant of good faith and fair dealing is duplicative of the breach of contract claim. The Court considers each argument in turn.

1. WIMC and GTIA Were Not Parties to the Mortgage Contract and Plaintiffs Have Failed to Plead Facts to Justify Piercing the Corporate Veil

Under Florida law, "a third-party cannot be bound by a contract to which it was not a party." *Miles v. Naval Aviation Museum Found., Inc.*, 289 F.3d 715, 720 (11th Cir. 2002). As a result, a plaintiff may not assert a breach of contract claim against a third party. *See Oginsky v. Paragon Props. of Costa Rica LLC*, 784 F. Supp. 2d 1353, 1372 (S.D. Fla. 2011) ("Any actions taken by nonparties, even if inconsistent with the contracts, cannot give rise to a cause of action for breach of contract against [an actual contracting party].").

Here, the parties to the mortgage contract were GTS and Plaintiffs. (FAC ¶ 26.) Neither WIMC nor GTIA participated in the negotiation or execution of the contract. Nevertheless, Plaintiffs argue that the Court should pierce the corporate veil and hold WIMC and GTIA liable for the actions of GTS because (i) WIMC "exercised complete domination and control" over GTS and GTIA, and (ii) GTS and GTIA "operated as mere instrumentalities of WIMC." (Opp'n at 5–6.)[3]

Under Florida law, a court may pierce the corporate veil among parents and subsidiaries such that the parent and one of the parent's subsidiaries may be held liable for the actions of a second subsidiary. *See, e.g.*, *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1117–21 (Fla. 1984); *see also John Daly Enters., LLC v. Hippo Golf Co.*, 646 F. Supp. 2d 1347, 1353 (S.D. Fla. 2009). However, Florida courts "are reluctant to pierce the corporate veil and only in exceptional cases will they do so." *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998) (internal quotation marks omitted). In order to pierce the corporate veil, a party must assert "(1) that the subsidiary was a 'mere instrumentality' of the parent, *and* (2) that the parent engaged in 'improper conduct' through its organization or use of the subsidiary." *Id.* (quoting *Dania Jai-Alai Palace*, 450 So. 2d at 1117–21).

---

[3] Despite Plaintiffs' argument to the contrary, the law is clear that a Court may consider a claim for piercing the corporate veil on a motion to dismiss. *See, e.g.*, *Oginsky*, 784 F. Supp. 2d at 1373–74 (dismissing a claim to pierce corporate veil on a motion to dismiss); *1021018 Alberta Ltd. v. Netpaying, Inc.*, 10-cv-568, 2011 WL 1103635, at *7 (M.D. Fla. Mar. 24, 2011) (same).

4

To show that a subsidiary was a "mere instrumentality," a plaintiff must demonstrate that the subsidiary "manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Lobegeiger v. Celebrity Cruises, Inc.*, 869 F. Supp. 2d 1350, 1354 (S.D. Fla. 2012) (internal quotation marks omitted). Florida courts typically consider a variety of factors when determining whether a subsidiary was a mere instrumentality of a parent, including whether:

> (1) the parent and the subsidiary have common stock ownership; (2) the parent and the subsidiary have common directors or officers; (3) the parent and the subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements and tax returns; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operates with grossly inadequate capital; (8) the parent pays the salaries and other expenses of the subsidiary; (9) the subsidiary receives no business except that given to it by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; and, (12) the subsidiary does not observe the basic corporation formalities, such as keeping separate books and records and holding shareholder and board meetings.

*United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co.*, 855 F.2d 1499, 1505 (11th Cir. 1988); *Jacksonville Elec. Auth. v. Eppinger & Russell Co.*, 776 F. Supp. 1542, 1545 (M.D. Fla. 1991), *aff'd sub nom.*, *Jacksonville Elec. Auth. v. Bernuth Corp.*, 996 F.2d 1107 (11th Cir. 1993). In addition, to demonstrate that a parent engaged in improper conduct, a plaintiff must allege that the parent used the subsidiary "to evade some statute or to accomplish some fraud or illegal purpose," such as by avoiding liability in a particular transaction. *Johnson Enters. of Jacksonville*, 162 F.3d at 1320 (internal quotation marks and alterations omitted); *see also Intercoastal Realty, Inc. v. Tracy*, No. 09-cv-62035, 2010 WL 2541876, at *4 (S.D. Fla. June 22, 2010) (finding that a parent used an "LLC for an unjust purpose" because it used the LLC to "circumvent a contractual obligation" of the parent).

To support their claim that GTS and GTIA were mere instrumentalities of WIMC and that WIMC abused the corporate form of GTS and GTIA to engage in improper conduct, Plaintiffs allege that, "at all relevant times, WIMC actively participated in and controlled the operations" of GTS and GTIA and that WIMC "is and was responsible for the acts" of GTS and GTIA. (FAC ¶¶ 11–12.) However, the Court finds that Plaintiffs' allegations related to the mere instrumentality element are wholly conclusory and, therefore, insufficient to justify the piercing of the corporate veil.

Plaintiffs' mere assertion that WIMC exercises control over GTS and GTIA – without more – fails to address any of the factors listed above and is insufficient to establish a plausible claim that GTS and GTIA were "mere instrumentalities" of WIMC. *See Lobegeiger*, 869 F. Supp. 2d at 1355 (declining to pierce the corporate veil where the record was "so sparse" that the court could not determine whether any of the relevant factors had been established). Florida courts have reached similar conclusions when plaintiffs merely allege that a parent controlled a subsidiary. *See, e.g.*, *Christie v. Bank of Am., N.A.*, No. 13-

5

cv-1371, 2014 WL 5285987, at *6 (M.D. Fla. Oct. 15, 2014) (evaluating a similar force-placed insurance scheme and holding that the plaintiff's allegations that the defendant-parent "conducted, managed, and controlled [the defendant-subsidiary's] affairs" were insufficient to pierce the corporate veil); *Oginsky*, 784 F. Supp. 2d at 1373 (declining to pierce the corporate veil where the plaintiffs alleged only that the defendants were "nothing more than shell corporations"); *see also see also Federated Title Insurers, Inc. v. Ward*, 538 So. 2d 890, 891 (Fla. Dist. Ct. App. 1989) ("A mere instrumentality finding is rare.").

Accordingly, because Plaintiffs allege only a few conclusory allegations to demonstrate that GTS and GTIA were "mere instrumentalities" of WIMC, and because Florida courts are reluctant to pierce the corporate veil, the Court denies Plaintiffs' request to pierce the corporate veil and dismisses Plaintiffs' breach of contract claims against WIMC and GTIA. Nevertheless, the Court must still evaluate the remaining breach of contract allegations against GTS.

2. Plaintiffs Did Not Materially Breach the Mortgage Contract

To assert a breach of contract claim under Florida law, a plaintiff must plead "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). In addition, "in order to maintain an action for breach of contract, a claimant must also prove performance of its obligations under the contract or a legal excuse for its nonperformance." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006); *Marshall Const., Ltd. v. Coastal Sheet Metal & Roofing, Inc.*, 569 So. 2d 845, 848 (Fla. Dist. Ct. App. 1990) (same).

Here, GTS argues that Plaintiffs cannot assert a breach of contract claim against it because Plaintiffs themselves breached the mortgage contract in the first instance by failing to maintain hazard insurance on their property. (*See* Purifoy Mortgage § 5 (noting that "Borrower *shall* keep" property insured against hazard loss (emphasis added)).)

However, while it is undisputed that Plaintiffs failed to provide evidence of hazard insurance on their property from at least September 16, 2011 to November 16, 2011, as required by the express terms of the mortgage contract (*see* FAC ¶¶ 27, 32, Ex. 8), it can hardly be argued that Plaintiffs' failure to buy hazard insurance was a material breach that went to "the essence of the mortgage," since the contract itself contemplated and provided remedies in the event of such an occurrence. *See MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 849 (11th Cir. 2013) ("To constitute a vital or material breach, a party's nonperformance must go to the essence of the contract. A party's failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach." (citation and internal quotation marks omitted)). Indeed, courts that have addressed this very issue in the mortgage context have found that "a mortgagor's failure to maintain insurance does not amount to a material breach of the mortgage" because the failure to maintain hazard insurance does not "defeat[] the object of the parties in making the contract." *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 552–53 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Smith v. SunTrust Mortg. Inc.*, No. 13-cv-0739, 2013 WL 5305651, at *6 (C.D. Cal. Sept. 16, 2013). The Court agrees.

6

In any event, even if it could be argued that Plaintiffs' failure to provide hazard insurance constituted a breach of the mortgage, GTS's argument would still fail because GTS waived this defense once it continued to perform under the contract following Plaintiffs' alleged breach. *See Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1300, 1309 (S.D. Fla. 2014) ("There are few principles of contract law better established, or more uniformly acknowledged, than the rule that when a contract not fully performed on either side is continued in spite of a known excuse . . . the defense based on the excuse is lost and the party who would otherwise have been excused is liable if he or she subsequently fails to perform." (quoting 13 Williston on Contracts § 39.31 (4th ed. 2000))). "[O]nce [GTS] chose to continue the mortgage by forceplacing insurance after Plaintiffs' coverage lapsed, [GTS] waived the right to rely upon Plaintiffs' failure to maintain insurance as a defense to their contract claims." *Mahdavieh v. Suntrust Mortg., Inc.*, No. 13-cv-62801, 2014 WL 1365425, at *3 (S.D. Fla. Apr. 7, 2014); *see also Persaud v. Bank of Am., N.A.*, No. 14-cv-21819, 2014 WL 4260853, at *8 (S.D. Fla. Aug. 28, 2014) (same). Accordingly, the Court finds that Plaintiffs' failure to procure hazard insurance under the terms of the mortgage contract does not warrant dismissal of their breach of contract claim against GTS.

### 3. The Mortgage Contract Permitted Backdating, but Is Ambiguous as to Whether It Permitted GTS's Collection of Commissions

GTS next argues that Plaintiffs' breach of contract claim must be dismissed because Plaintiffs have failed to allege conduct that violated the terms of the mortgage contract. Specifically, GTS argues that the mortgage contract permitted GTS to (i) backdate and select a force-placed insurance policy on Plaintiffs' property, and (ii) receive a commission for purchasing the policy. The Court addresses each of these arguments in turn.

#### a. Backdating

In order to evaluate whether GTS was permitted to backdate the force-placed insurance, the Court must first examine the terms of the mortgage contract and determine whether the contract unambiguously permitted, or proscribed, such conduct. *See Managed Care Solutions, Inc. v. Cmty. Health Sys., Inc.*, No. 10-cv-60170, 2011 WL 6024572, at *6 (S.D. Fla. Dec. 2, 2011) ("Whether a contract is or is not ambiguous is a question of law to be determined by the trial court." (internal quotation marks omitted)).

A contract is "ambiguous if it is susceptible to two or more reasonable interpretations that can fairly be made." *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993). If a contract is unambiguous, "it is well settled" under Florida law that "the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001) (internal quotation marks omitted). However, when "a contract is reasonably or fairly susceptible of different constructions, it is ambiguous, and because interpretation of ambiguous contracts potentially involves questions of fact, dismissal under Rule 12(b)(6) is inappropriate." *Ventana Hotels & Resorts, LLC v. Habana Libre Hotel, LLC*, No. 06-cv-22993, 2007 WL 2021940, at *2 (S.D. Fla. July 11, 2007) (citations omitted); *see also Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1312 (S.D. Fla.

7

2014) ("Contract interpretation [of an ambiguous contract] is typically inappropriate at the motion to dismiss stage.").

Here, GTS argues that its backdating of the force-placed insurance does not constitute a breach of the mortgage contract because the mortgage permitted GTS to "obtain coverage that would protect the property during the entire period of [Plaintiffs'] lapse." (Mem. at 8.) To support this argument, GTS highlights that the mortgage required Plaintiffs to have insurance "for the periods that Lender requires." (Purifoy Mortgage § 5.) The mortgage also provided that "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property." (*Id.* § 9.)

In evaluating similar contract provisions, several courts have held that backdating coverage is "entirely necessary to protect [a lender's] full interest in the property." *Edwards v. Green Tree Servicing, LLC*, No. 15-cv-148, 2015 WL 6777463, at *4 (N.D. Fla. Oct. 22, 2015); *see also Cannon v. Wells Fargo Bank N.A.*, No. 12-cv-1376, 2013 WL 3388222, at *4–5 (N.D. Cal. July 5, 2013); *Webb v. Chase Manhattan Mortg, Corp.*, No. 05-cv-0548, 2008 WL 2230696, at *19 (S.D. Ohio May 28, 2008). In reaching this conclusion, courts have recognized that, even though a borrower may have alleged that its property suffered no loss during the backdated time period, it was nevertheless reasonable and appropriate for a lender to procure backdated insurance since "some damage may not be readily apparent (such as mold)." *Cannon*, 2013 WL 3388222, at *4–5. Similarly, courts have held that the "broad language" permitting a lender to do "whatever it deems reasonable or appropriate to protect [its] rights in the property provides the lender with a contractual right to have continuous coverage on the property," regardless of whether there had been damage to the property in the interim, since the lender could not know whether "property loss had occurred during the lapse period." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 613 (7th Cir. 2013). *But see Persaud*, 2014 WL 4260853, at *9 (finding that backdating coverage would "not protect Defendants' interest in the property, particularly in the absence of any claim or damage to the property during the period of the lapse" (internal quotation marks omitted)).

The Court agrees that the broad language of the mortgage allowed for GTS's procurement of backdated insurance and that such insurance was "reasonable" and "appropriate" to protect GTS's interest in the property. Plaintiffs' assertion that there was "no risk of loss" during the lapse in coverage (FAC ¶ 31) and, therefore, no need to backdate the force-placed insurance because "the purpose of insurance is to protect against future risks" (Opp'n at 9), misconstrues the nature of hazard insurance and the risks that accompany lapses in insurance coverage. For the reasons stated by the Seventh Circuit in *Cohen* and other courts in similar force-placed insurance cases, the Court finds that Plaintiffs cannot plausibly allege that no loss occurred during the lapse period since some problems can take several weeks or months to emerge – a risk that a lender would be loath to take. *See Cohen*, 735 F.3d at 613 (noting that plaintiff's allegation that defendants "knew full well that no loss" occurred during the lapse in coverage "is conclusory and unaccompanied by any factual content to make it plausible"); *id.* ("How could [defendants] know . . . whether or not a property loss had occurred during the lapse period?"). Indeed, the fact that GTS backdated the force-placed insurance for *only two months* to cover Plaintiffs' gap in insurance (FAC ¶ 31) supports the inference

8

that GTS acted "prudently [to] ensure[] it will be covered if it later" became aware of a loss. *Rapp v. Green Tree Servicing, LLC*, No. 12-cv-2496, 2013 WL 3992442, at *6 (D. Minn. Aug. 5, 2013); *see also Miller*, 994 F. Supp. 2d at 554 (granting lender's motion to dismiss borrower's breach of contract claim based on allegedly improperly backdating force-placed insurance because borrower failed to plausibly allege that "lender *knew* that no loss had occurred" during the lapse in coverage). Accordingly, because backdating was permitted by the mortgage contract and because Plaintiffs do not state a plausible claim that Defendants' backdating of the force-placed insurance constituted a breach of the mortgage, the Court grants GTS's motion to dismiss Plaintiffs' breach of contract claim with respect to the alleged backdating.

    b.  Commission Payments in the Purchase of Force-Placed Insurance

GTS next argues that its purchase of force-placed insurance that included commissions did not breach the mortgage contract because the mortgage unambiguously permitted GTS to purchase force-placed insurance and charge Plaintiffs for the "actual cost" of the insurance. (Mem. at 9–10.) GTS notes that the mortgage authorized the Lender to "obtain insurance, at Lender's option and Borrower's expense," in the event of Borrower's failure to maintain insurance, and that the Lender was "under no obligation to purchase any particular type or amount of coverage." (Purifoy Mortgage § 5.) The mortgage further provided that "Borrower acknowledges that the cost of insurance . . . might significantly exceed the cost of insurance that Borrower could have obtained" and that "[a]ny amounts disbursed under this Section 5 shall become additional debt of Borrower." (*Id.*) Finally, GTS highlights, once again, that Plaintiffs' failure "to perform the covenants" in the mortgage authorized GTS to "do and pay for whatever is reasonable or appropriate to protect" its interest in Plaintiffs' property. (*Id.* § 9.)

However, while the Court agrees that the mortgage granted GTS broad discretion in purchasing force-placed insurance, the mortgage contract is at best ambiguous as to whether it was "reasonable or appropriate" for GTS, through GTIA, to take commissions from the placement, thereby inflating the price of the insurance. Similarly, while the mortgage contract provided that Lender was "under no obligation to purchase any particular type or amount of coverage" and warned Plaintiffs that the force-placed insurance might be more expensive than what they would have obtained themselves, it is by no means clear that the purchase of insurance for "nearly twice the estimated fair market value" of Plaintiffs' home was "reasonable or appropriate" or otherwise consistent with GTS's obligation under the mortgage. (FAC ¶ 31.)

Significantly, several courts that have considered nearly identical contract provisions have reached the same conclusion. For example, in *Leghorn v. Wells Fargo Bank, N.A.*, the court evaluated a mortgage contract with similar language and held that the borrower stated a breach of contract claim based on a kickback theory because the mortgage contract "did not unambiguously authorize kickbacks." 950 F. Supp. 2d 1093, 1117–18 (N.D. Cal. 2013). The court further found that the language that permitted the lender to "do whatever is reasonable or appropriate to protect Lender's interest in the Property" was ambiguous and "could be interpreted as explicitly restricting the lender's discretion in force-placing insurance." *Id.* (internal quotation marks omitted); *see also, e.g.*,

*Persaud*, 2014 WL 4260853, at \*9 ("Plaintiff has sufficiently alleged Defendants' illegitimate premiums, including kickbacks . . . , are not 'reasonable or appropriate' and constitute a breach of the Mortgage."); *Mahdavieh*, 2014 WL 1365425, at \*3 ("While Plaintiffs' mortgage gave [defendant] discretion to force-place insurance, it did not necessarily permit [defendant] to do so in the manner alleged by Plaintiffs."); *Gordon v. Chase Home Fin., LLC*, No. 11-cv-2001, 2013 WL 256743, at \*4 (M.D. Fla. Jan. 23, 2013); *Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1085 (N.D. Cal. 2012) (denying defendant's motion to dismiss plaintiff's breach of contract claim because "the court could not say that the contracts' terms unambiguously authorize Defendants' alleged behavior" of purchasing high-priced insurance and collecting a commission (internal quotation marks omitted)).

Moreover, GTS's reliance on *McKenzie v. Wells Fargo Home Mortgage, Inc.* and *LaCroix v. U.S. Bank, N.A.* is misplaced, as those cases are readily distinguishable. In *McKenzie*, the court held that the plaintiffs failed to plausibly allege that the defendants were involved in a scheme to collect high-priced insurance, including kickbacks, because the complaint "include[d] *no facts* supporting the conclusion" that the force-placed insurance was "excessively priced." No. 11-cv-04965, 2012 WL 5372120, at \*20 (N.D. Cal. Oct. 30, 2012) (emphasis added). Similarly, in *LaCroix*, the court held that the plaintiff's allegation that the defendant received kickbacks or commissions from its purchase of force-placed insurance failed to state a breach of contract claim because the complaint contained "*no factual support* underlying the allegation that [the defendant] profited from the force-placed policy." No. 11-cv-3236, 2012 WL 2357602, at \*6 (D. Minn. June 20, 2012 (emphasis added). However, contrary to those cases, Plaintiffs here plausibly allege that GTS's purchase of force-placed insurance was excessively priced and that GTS profited from this scheme. First, Plaintiffs allege GTS purchased force-placed insurance for coverage that was "nearly twice the estimated fair market value" of their home. (FAC ¶ 31.) Second, Plaintiffs allege that GTS entered into a contract with Assurant "pursuant to which [GTS, through GTIA,] receive[d] payments for the referral of business." (*Id.* ¶¶ 30, 47.) As a result, Plaintiffs have plausibly alleged that GTS had "no incentive to select a competitively priced product" and, therefore, "artificially inflated" Plaintiffs' insurance premiums to fund these commissions. (*Id.* ¶¶ 45, 65, 74–75.) While Plaintiffs do not allege a specific monetary amount that GTS received from this scheme, the Court finds that the facts alleged plausibly support the inference that GTS collected and profited from improper commissions through this scheme.[4]

Finally, GTS contends that it did not breach the mortgage because it notified Plaintiffs twice through letters that, if Plaintiffs failed to secure insurance, it might purchase force-placed insurance and earn a commission on such purchase. (*See* FAC Exs. 4–5 ("Please note that if we do buy insurance coverage on the collateral, we will do so through an affiliated insurance agency . . . and may earn a commission on the insurance policy.").) However, the fact

---

[4] In addition, notwithstanding GTS's claim to the contrary, the fact that some of these allegations are based on information and belief is of no moment. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (noting that a plaintiff may plead such facts alleged "upon information and belief" as long as those "facts are peculiarly within the possession and control of the defendant" or "where the belief is based on factual information that makes the inference of culpability plausible"); *Dubyk v. RLF Pizza, Inc.*, No. 13-cv-81028, 2014 WL 1153044, at \*2 (S.D. Fla. Mar. 17, 2014) (same).

that GTS sent *letters* warning Plaintiffs that they might purchase force-placed insurance through an affiliate and earn a commission does not mean that the practice was permitted – *i.e.*, "reasonable" and "appropriate" – under *the mortgage contract*.

Accordingly, the Court denies GTS's motion to dismiss the breach of contract allegations related to the reasonableness or appropriateness of the force-placed insurance policies and payments of commissions to GTS.

4. Plaintiffs' Claim Based on the Breach of the Implied Covenant of Good Faith and Fair Dealing Is Duplicative of Their Breach of Contract Claim

GTS argues that Plaintiffs' breach of contract allegations based on the implied covenant of good faith and fair dealing must be dismissed because they are "superfluous" and mirror Plaintiffs' other breach of contract allegations. (Mem. at 12.) "Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005). "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Id.* However, an argument based on the "breach of the implied covenant of good faith and fair dealing may be dismissed as redundant where it is based on the same allegations as those underlying the breach of contract claim." *Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012) (internal quotation marks omitted).

Here, Plaintiffs allege that GTS breached the mortgage's implied duty of good faith and fair dealing when it chose "an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting high-priced force-placed insurance" and charging Plaintiffs for the inflated price and commission payments. (FAC ¶ 99(a).) In essence, these allegations are identical to the allegations that form the basis of Plaintiffs' breach of contract claim – namely, that it was not reasonable or appropriate to purchase expensive force-placed insurance that included commission payments. (*Compare id.* ¶ 93(a)–(f), *with id.* ¶ 99(a)–(e), (g).) Accordingly, since the conduct that serves as the basis of these two theories is the same, the Court dismisses the implied covenant of good faith and fair dealing allegations as duplicative of the breach of contract allegations. *See Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000) ("If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.").

Plaintiffs contend that these allegations are not redundant because "it is well-settled law that when a contract gives a party discretion to act under the contract, that party must exercise its discretion in good faith." (Opp'n at 14.) However, under Florida law, an alleged breach of the implied covenant of good faith and fair dealing that is based on a party's failure to exercise its discretion under a contract in good faith may not be asserted as an independent basis for a breach of contract unless "one party has the power to make a discretionary decision *without defined standards*," meaning without some limiting principle. *Saxon Fin. Grp., Inc. v. Rath*, No. 11-cv-80646, 2012

11

WL 3278662, at *7 (S.D. Fla. Aug. 9, 2012) (emphasis added) (internal quotation marks omitted). Put another way, Florida law makes clear that the implied covenant of good faith and fair dealing may not vary the terms of an express contract. *See QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012) (noting that the implied covenant of good faith and fair dealing is inapplicable "where application of the covenant would contravene the express terms of the agreement"); *see also Speedway SuperAmerica, LLC v. Tropic Enters., Inc.*, 966 So. 2d 1, 3 (Fla. Dist. Ct. App. 2007) ("Despite broad characterizations of the implied covenant of good faith, we have recognized that it is a gap-filling default rule, which comes into play when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." (internal quotation marks omitted)).

Here, GTS's discretion in determining what type of force-placed insurance it may purchase in the event that Plaintiffs failed to purchase insurance was governed by the express terms of the mortgage, which stated that if Plaintiffs failed "to perform the covenants and agreements" contained in the mortgage, including the covenant to maintain hazard insurance as required under Section 5, GTS was free to "do and pay for whatever was reasonable or appropriate" to protect its interest in Plaintiffs' property. (Purifoy Mortgage §§ 5, 9.) As a result, Plaintiffs cannot vary these express terms of the mortgage contract by asserting a separate claim based on the implied covenant of good faith and fair dealing. Indeed, the Florida cases cited by Plaintiffs to support their implied covenant of good faith and fair dealing claim are inapposite, since the contracts in those cases did not contain the same express standards as Plaintiffs'

mortgage in the present action. *See, e.g., Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11-CV-81373, 2012 WL 2003337, at *5 (S.D. Fla. June 4, 2012) (denying dismissal of claims based on the breach of the implied covenant of good faith and fair dealing, but recognizing that such a claim is permissible only when "a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards" (internal quotation marks omitted)); *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1278–79 (S.D. Fla. 2009) (denying dismissal of a breach of the implied covenant of good faith claim where it is not alleged that the lender may do whatever is reasonable or appropriate to protect its interest in borrower's property).

Accordingly, the Court grants GTS's motion to dismiss Plaintiffs' claim regarding the implied covenant of good faith and fair dealing.

B. Unjust Enrichment

Defendants next argue that Plaintiffs' unjust enrichment claim should be dismissed because such claims may not be asserted when the parties' rights are governed by a mortgage contract. Defendants further contend that, in any event, Plaintiffs have failed to plausibly allege all of the elements of an unjust enrichment claim. The Court agrees.

To assert an unjust enrichment claim under Florida law, a plaintiff must plausibly allege that "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012).

However, "a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218, 1227 (S.D. Fla. 2013) (internal quotation marks omitted). And, while, as a general matter, Rule 8(d) of the Federal Rules of Civil Procedure permits a plaintiff to plead causes of action in the alternative, "unjust enrichment may only be pleaded in the alternative where one of the parties asserts that the contract governing the dispute is invalid." *Id.*; *see also US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1546–47 (2013) (citing Restatement (Third) of Restitution and Unjust Enrichment § 2(2) (2010) for the proposition that a "valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment").

Here, Plaintiffs do not dispute the validity of the mortgage contract between themselves and GTS, and neither party disputes that the contract governs the terms under which the force-placed insurance clause is to be executed. Accordingly, Plaintiffs' unjust enrichment claim against GTS must be dismissed as duplicative. Several district courts in Florida have reached similar results. For example, in *Degutis v. Financial Freedom, LLC*, the court dismissed an alternative unjust enrichment claim because the plaintiff did "not contest that there was a valid mortgage contract between the Parties." 978 F. Supp. 2d 1243, 1266 (M.D. Fla. 2013); *see also, e.g.*, *Gibson v. Chase Home Fin., LLC*, No. 11-cv-1302, 2012 WL 1094323, at *2 (M.D. Fla. Apr. 2, 2012) ("Gibson never questions the validity of the mortgage. Chase's alleged wrong arises from Chase's alleged abuse of the contractual privilege to force-place insurance. In consequence, this action permits no equitable claim for unjust enrichment."); *Gordon*, 2012 WL 750608, at *4 ("Here, the parties do not dispute the existence of an express contract governing their transaction, the mortgage, and, accordingly, the equitable remedy of unjust enrichment is not available."). While the Court acknowledges that some Florida courts have reached the opposite result on the grounds that, at the motion to dismiss stage, there has not been a "*showing* that an express contract exists," *see, e.g.*, *Martorella*, 931 F. Supp. 2d at 1227–28 (emphasis added), the Court nevertheless finds these cases to be distinguishable from the present case, in which there is no dispute as to the validity of the mortgage contract. *See Cent. Magnetic Imaging Open MRI of Plantation, Ltd. v. State Farm Mut. Auto. Ins. Co.*, 789 F. Supp. 2d 1311, 1317 (S.D. Fla. 2011) ("As there is a valid express contract that no party challenges, Plaintiff may not recover[] under unjust enrichment, and may not assert it as an alternative claim.").

Of course, Plaintiffs are not barred from asserting a claim for unjust enrichment against WIMC nor GTIA, since neither was a party to the mortgage contract. *See Persaud*, 2014 WL 4260853, at *14 (declining to dismiss plaintiff's unjust enrichment claim against defendants who were not parties to the contract); *Walton Const. Co., LLC v. Corus Bank*, No. 10-cv-137, 2011 WL 2938366, at *4 (N.D. Fla. July 21, 2011). However, Plaintiffs' unjust enrichment claims against WIMC and GTIA must be dismissed for the simple reason that Plaintiffs allege no facts to suggest that either defendant received or retained a benefit from Plaintiffs. For instance, Plaintiffs allege that GTIA merely served as "conduit for Assurant to return kickbacks and commissions" to GTS (FAC ¶ 13), but they fail to allege that GTIA ever retained a benefit from this force-placed insurance scheme. Similarly, Plaintiffs' conclusory

13

allegations that the commissions collected by GTS "ultimately" benefited WIMC (*id.* ¶¶ 103–04) fail to plausibly allege that WIMC either received or retained a benefit. Contrary to Plaintiffs' assertions, this case is not like *Hamilton v. Suntrust Mortgage Inc.*, in which the court upheld an unjust enrichment claim against the intermediary in a forced-placed insurance scheme where the plaintiff alleged that the intermediary received and retained benefits "in the form of payments for the exorbitant force-placed insurance premiums." 6 F. Supp. 3d at 1318.

Accordingly, the Court grants Defendants' motion to dismiss the unjust enrichment claim against all Defendants.

### C. Conversion

In their final cause of action, Plaintiffs allege that Defendants converted money from Plaintiffs' mortgage escrow accounts by "charg[ing] the premium for the force-placed insurance policy to the [Plaintiffs'] escrow account." (FAC ¶¶ 29, 111–13.)[5] Under Florida law, conversion is "an unauthorized act which deprives another of his property permanently or for an indefinite time." *Tambourine Comercio Internacional SA v. Solowsky*, 312 F. App'x 263, 271 (11th Cir. 2009) (internal quotation marks omitted). Here, the Court finds that Plaintiffs' conversion claim must also be dismissed.

As an initial matter, Plaintiffs fail to allege that Defendants converted Plaintiffs' property. Instead, Plaintiffs merely allege that GTS "continues *to attempt to collect* an amount equal to $1,237.90" for the backdated force-placed insurance. (FAC ¶ 32 (emphasis added).) As a result, Plaintiffs have failed to allege that Defendants "deprive[d]" Plaintiffs of money or other property, and, therefore, the conversion claim must be dismissed.

Moreover, even if Plaintiffs alleged that Defendants *had* converted Plaintiffs' money, their conversion claim would still be dismissed against GTS for the additional reason that, under Florida law, a breach of contract cannot form the basis of a tort claim for conversion. *See Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1541 (11th Cir. 1990); *Fla. Coll. of Osteopathic Med., Inc. v. Dean Witter Reynolds Inc.*, 982 F. Supp. 862, 866 (M.D. Fla. 1997) ("[W]here the facts surrounding a breach of contract action are indistinguishable from an alleged tort, and where the alleged tort does not cause harm distinct from that caused by the breach of contract, a plaintiff is barred from bringing a separate tort action."). This limitation is based on the concept that "contract principles are more appropriate than tort principles to resolve purely economic claims." *Eye Care Int'l, Inc. v. Underhill*, 92 F. Supp. 2d 1310, 1314 (M.D. Fla. 2000). As a result, in order to assert a claim for conversion where a contractual relationship exists, the "conversion must go beyond, and be independent from, a failure to comply with the terms of a contract." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008).

Here, it is clear that Plaintiffs' claim for conversion relies on the same conduct that serves as the basis of their breach of contract claim – namely, that GTS improperly charged Plaintiffs for the purchase of high-priced force-placed insurance. (*See* FAC ¶ 113 (alleging that Defendants wrongfully withdrew funds from borrowers' mortgage escrow accounts "in order to fund [their]

---

[5] The Purifoy Mortgage permitted Defendants to place Plaintiffs' payments for taxes and assessments, leasehold payments, and premiums on all insurance required under Section 5 in an escrow account. (Purifoy Mortgage § 3.)

14

force-placed insurance scheme").) To the extent Plaintiffs' conversion claim is based on GTS's alleged breach of the "duty to maintain and preserve" Plaintiffs' mortgage escrow account (FAC ¶ 111), the Court finds that this claim is also rooted in GTS's allegedly unreasonable and inappropriate purchase of high-priced force-placed insurance, which was credited against Plaintiffs' escrow account. *See Maloney v. Indymac Mortg. Servs.*, No. 13-cv-04781, 2014 WL 6453777, at *7 (C.D. Cal. Nov. 17, 2014) (noting that, where plaintiff does not dispute that defendant had "the right to use escrow funds to pay for flood insurance" and merely states that "the disposition of escrow funds was wrongful because the [defendant] was not authorized to spend escrow funds pursuant to a kickback scheme and was not authorized to purchase the level of insurance that it did," the allegations "are the core of Plaintiff's breach of contract claims, and are better resolved in that context"). As a result, the Court grants GTS's motion to dismiss the conversion claim for this additional reason.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is DENIED with respect to Plaintiffs' breach of contract claim against GTS for allegedly improperly purchasing and collecting commissions on force-placed insurance. IT IS FURTHER ORDERED THAT Defendants' motion to dismiss is GRANTED in all other respects. Because there are no remaining claims against Defendants WIMC and GTIA, the Clerk of the Court is respectfully directed to terminate them from this action. Because discovery is now completed (Doc. No. 52), the parties shall appear for a post-discovery conference on January 26, 2016 at 10:00 a.m. If any party wishes to file a motion for summary judgment, it shall submit a pre-motion letter to the Court in accordance with Rule 2.A of the Court's Individual Practices no later than January 11, 2016.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: December 21, 2015
New York, New York

\* \* \*

Plaintiffs are represented by Kenneth G. Gilman of Gilman Law, L.L.P., 8951 Bonita Beach Road, Suite 525-405, Bonita Springs, Florida 34135, and Brian C. Kerr and David A.P. Brower of Brower Piven, 488 Madison Avenue, New York, New York 10022.

Defendants are represented by David S. Versfelt of K&L Gates LLP, 599 Lexington Avenue, New York, New York 10022, and John B. Sullivan, Erik W. Kemp, and Mark D. Lonergan of Severson & Werson, One Embarcadero Center, Suite 2600, San Francisco, California 94111.

15